# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KRASIMIR DACHEV, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 17-cv-5729 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| RICH AMERICA, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, the motion to dismiss [65] filed by Defendants Rich America, Inc. and Leonard Goodrum (collectively, "Defendants") is denied.[1] This case is set for further status hearing on January 16, 2020, at 9:00 a.m.

## I.     Background[2]

Peace for You Peace for Me (the "Foundation") is a private non-profit foundation registered under Bulgarian law, with its principal place of business is Sofia, Bulgaria. [62 at ¶ 2.] The Foundation was formed to organize and hold a charity concert to help homeless and displaced children in world conflict zones. [*Id*.] Plaintiff Krasimir Dachev is a resident of Sofia, Bulgaria and was a sponsor of the Foundation. [*Id*. at ¶ 3.] Plaintiff Svilosa is a publicly-traded company organized under the laws of Bulgaria and listed on the Bulgarian Stock Exchange. [*Id*. at ¶ 4.] Svilosa was the primary investor in the Foundation and the planned charity concert. [*Id*.]

---

[1] Plaintiffs also bring claims against Brandon Allen. However, the Court entered an order of default against Allen on October 10, 2017 [22] and Allen has not taken any action in this Court.

[2] For purposes of this motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

In early 2016, Dachev and Svilosa decided to help organize an all-day charity concert, patterned after the 1985 Live Aid concert and the 2010 Hope for Haiti Now concert, that would be internationally televised on October 1, 2016 (the "Charity Event"). [*Id*. at ¶ 12.] Plaintiffs allege that Defendants—in discussions with Krassimire Kourtev, an agent and representative of the Foundation—agreed to secure the performances "of various preferred artists" for the concert. [*Id*. at ¶ 14.] Dachev and Svilosa agreed to loan the Foundation most, if not all, of the money necessary to secure artists. [*Id*. at 15.] Plaintiffs allege that "their loans would be paid back with the proceeds generated by the ticket sales for admission to the charity concert" and that "any money sent to Defendants to secure an artist who declined the offer, or who otherwise could not be secured to perform, would be returned to Plaintiffs." [*Id*. at 16.] Plaintiffs also allege that "Defendants agreed to act as Plaintiffs' agent and use the money provided by Plaintiffs to secure Plaintiffs' preferred artists." [*Id*.]

Around August 2016, Defendant Brandon Allen—an officer and/or representative of Defendant Rich America, Inc. ("RA")—wrote to Kourtev representing that RA, "in coordination with RCA Records ("RCA") & Sony Music Group ("Sony")," would contact various celebrities to "secure performance contracts" for the charity concert, then less than two months away. [*Id*. at ¶ 22.] Plaintiffs allege that in reliance on that representation, "the Foundation, Dachev and Svilosa entered into a loan agreement, whereby Dachev and Svilosa agreed to loan the Foundation monies to be provided to RA for the purpose of securing artists to perform at the charity event." [*Id*. at ¶ 24.] The loan funds, which the Foundation agreed to repay, were provided directly to RA. [*Id*. at 25.]

Defendants sent various written agreements to Plaintiffs purporting to book various celebrities, including Britney Spears, Snoop Dogg, Attika 7, Georgios Tsalikis, and DJ Markus

Schultz. [*Id*. at ¶26.] In these written agreements, Allen represented that he was the "agent" of the artist subject to the agreement. [*Id*. at 41.] The agreements required that deposits (*e.g.,* $142,800 for Britney Spears and $150,000 for Snoop Dogg) immediately be transferred to Defendants to "secure the date." [*Id*. at 44.] Defendants transmitted to Plaintiffs video recordings of celebrities purporting to commit to the 2016 concert. [*Id*. at ¶ 55.] In one such video, an individual purporting to be Snoop Dogg says to "get ready" for the October 1, 2016 concert. [*Id*.] In August and September 2016, the Foundation, Dachev, and Svilosa collectively sent Defendants a total of $367,800 to "secure" these celebrities for the event. [*Id*. at ¶¶ 45-46.]

After receiving Plaintiffs' money, Defendants failed to secure any major celebrity for the 2016 concert, claiming, among other things, that Snoop Dogg "backed out" of the event and that the deposit money Plaintiffs paid to "secure" Britney Spears had instead been paid to "Natalie LaRose," an artist Plaintiffs did not authorize or want. [*Id*. at ¶ 58.] Plaintiffs were forced to cancel the 2016 concert because Defendants had not secured the promised celebrities. [*Id*. at 62.] Still, Plaintiffs asked that Defendants apply the money they already had transferred to RA to secure artists for another concert to be held in June 2017 (the "2017 Concert"). From September 2016 through April 2017, Defendants represented that they were negotiating with celebrities for the 2017 concert. During that time, Defendants sent Plaintiffs emails with the following statements:

- "We are happy to announce verbal confirmations from JLo, Jessica Simpson, Rihanna, Beyoncé, Diana Ross, Ludacris, Smiley, Mohombi, Iggy Azalea and David Guetta."

- "The contract [with Natalie LaRose] is signed and cannot be canceled[.]"

- "We are still in the process of retrieving the Snoop Dogg deposit which will take some time but we are still debating keeping him for the show."

[*Id*. at ¶ 69.]   From at least December 2016, Plaintiffs repeatedly asked Defendants for an accounting of the money they had received for the purpose of booking celebrities.  [*Id*. at ¶ 70.] Defendants ignored these requests.  [*Id*. at 71.]

By February 2017, after six additional months of alleged booking efforts, Defendants failed to secure any major celebrity for the 2017 concert.  [*Id*. at 72.]  Plaintiffs subsequently discovered that (1) Defendants were not authorized to represent or act on behalf of Sony or RCA in this matter; (2) Defendants were not authorized to represent or act on behalf of any of the major celebrities promised by Defendants; (3) the major celebrities promised by Defendants had never received any deposit from Defendants, had never entered into any agreement with Defendants, and had never heard of Defendants; and (4) the video recording sent to Plaintiffs of Snoop Dogg supposedly announcing his performance at the 2016 concert was a fraudulent production featuring a celebrity look-alike claiming to be Snoop Dogg.  [*Id*. at ¶ 74.]

Plaintiffs bring this lawsuit against Defendants to recover more than $3,800,000 in damages allegedly incurred as a result of Defendants' misconduct.  Specifically, Plaintiffs seek to recover (a) approximately $350,000 tendered to Defendants; (b) deposits and/or payments for artists, hosts, hotels, airfare, stage and lighting vendors, and other service provider contracts for the planned 2016 concert totaling another $2,500,000; and (c) another $1,000,000 of payment obligations under various contracts.

On February 5, 2018, Defendants filed a motion to dismiss [30], which they later withdrew. See [34].  Plaintiffs filed an amended complaint [35], and Defendants filed a second motion to dismiss [38].  The Court granted the motion in part, dismissing certain contract claims, and denied it in part, declining to dismiss claims for fraud, conversion, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/2.  See [57]

Subsequently, Plaintiffs filed a second amended complaint ("SAC") [62], and Defendants filed their third motion to dismiss [65], which is now before the Court.

## II. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

## III. Analysis

### A. Prudential Standing

Defendants argue that the prudential standing doctrine bars Dachev's and Svilosa's individual claims for fraud, conversion, and violations of the ICFA. The Court has already addressed this issue. In its February 4, 2019 order [57], the Court noted that Defendants' second

motion to dismiss [38] did not address Dachev's and Svilosa's prudential standing to make claims

for fraud, conversion, or violations of the ICFA, and therefore waived the arguments:

> However, Defendants fail to make any prudential standing argument with respect to the remaining claims of Dachev and Svilosa. Because it is well-established that "prudential limitations are not jurisdictional[,]" *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 689 (7th Cir. 2015), "[p]rudential standing issues are subject to waiver[.]" *RK Co. v. See*, 622 F.3d 846, 851 (7th Cir. 2010). Even if third-party prudential standing principles apply, Defendants failure to address how such standing principles relate to the remaining claims of Dachev and Svilosa results in waiver of any such arguments. The Court therefore denies Defendants' motion to dismiss Dachev's and Svilosa's remaining claims for lack of prudential standing.

[57] at 10-11. The Court's previous ruling stands, and Defendants have given the Court no reason

to reconsider its finding; Defendants waived their prudential standing argument with respect to the

claims that remain in the case. The Court therefore denies Defendants' motion to dismiss Dachev's

and Svilosa's fraud, conversion, and ICFA claims for lack of prudential standing.

### B.     Fraud (Count I)

To state a fraud claim under Illinois law, a plaintiff must allege that the defendant: (i) made

a false statement of material fact; (ii) knew or believed the statement to be false; (iii) intended to

and, in fact, did induce the plaintiff to reasonably rely and act on the statement; and (iv) caused

injury to the plaintiff. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 766 (7th Cir. 2010)

(reciting Illinois law and citing *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 185 (1982)). Defendants

argue that the SAC fails to state a claim for fraud on two grounds. First, with respect to Dachev

and Silvosa, Defendants argue that the complaint fails to allege that any of Defendants'

misrepresentations were intended to induce Dachev or Silvosa to take any action. Second,

Defendants argue that none of the Plaintiffs justifiably relied on Defendants' statements.

The Court first considers whether the SAC sufficiently alleges that Defendants intended to

and in fact did induce Dachev and Silvosa to rely and act on Defendants' false statements.

6

Fraudulent intent may be alleged generally. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012); Fed.R.Civ.P. 9(b). The SAC does in fact allege Defendants' intent generally, asserting that Defendants "intended to induce Plaintiffs to act on [their] misrepresentations." [62 at ¶ 81]. The SAC also alleges Defendants' intent by describing and attaching the "Artist Agreements," which the SAC says were fake contracts that Defendants claimed were necessary to get commitments from musical artists. Each agreement required a deposit, which Defendants said were required to secure the performers for the date of the concert. See, *e.g.*, [62-2], requiring $142,000 deposit for Britney Spears. Plaintiffs allege that Defendants "intended to use the Artist Agreements in furtherance of their scheme to defraud to convince Plaintiffs that Defendants were working with large, well-known recording companies like Sony and RCA, and that they had the ability to follow through on booking acts like Britney Spears, Snoop Dogg, Attika 7, Georgios Tsalikis, and DJ Markus Schultz.". [*Id.* at ¶ 28]. Viewed in the light most favorable to Plaintiffs, the SAC sufficiently alleges that Defendants intended to induce Plaintiffs to act on Defendants' misrepresentation. The SAC also adequately alleges that Dachev and Svilosa did act on Defendant's false statements; paragraphs 24 and 25 explain that Dachev and Svilosa made a loan to the Foundation for the purpose of securing artists to perform at the Charity Event.

Next the Court addresses the issue of reasonable reliance. Illinois courts have held that the justifiable reliance element of fraud is a question of fact to be determined by the jury, not by the trial court as a matter of law. *Sims v. Tezak*, 296 Ill. App. 3d 503, 511 (1998); see also *Boyd Grp. (U.S.) Inc. v. D'Orazio*, 2015 WL 3463625, at *9 (N.D. Ill. May 29, 2015) ("Whether reliance is reasonable is generally ill-suited for determination on a motion to dismiss."); *Arlington Financial Corp. v. Ben Franklin Bank of Illinois*, 1999 WL 286080, at *4 (N.D. Ill. Apr. 29, 1999) ("the

existence of justifiable reliance generally is a question of fact not to be determined on a motion to dismiss").

Defendants note that if the facts are undisputed and only one conclusion is apparent, the court may dispose of the reliance issue. That is true—at summary judgment. *D.S.A Fin. Corp. v. Cty. of Cook*, 345 Ill. App. 3d 554, 560, (2003) (citing *Neptuno Treuhand–Und Verwaltungsgesellschaft Mbh v. Arbor*, 295 Ill. App. 3d 567, 575 (1998)). This case is not yet at that stage, and on the record currently before the Court, it is not clear that only one conclusion is apparent.

In any event, Plaintiffs have pleaded "facts indicating [their] reliance on the misrepresentation was justified," *Equity Builders & Contractors, Inc. v. Russell*, 406 F. Supp. 2d 882, 889 (N.D. Ill. 2005), including the short time between retaining Defendants and the date of the first concert [62 at ¶ 22], Defendants' emails suggesting that they were performing the job as promised [62 at ¶ 32], and Defendants' assurances that they were negotiating with celebrities to perform at the 2017 Concert [62 at ¶ 68]. This is enough to plead reasonable reliance.

Defendants also argue that after their failure to obtain artists for Plaintiffs' first concert, Plaintiffs should have known that Defendants would not or could not obtain artists for Plaintiffs' second concert, and therefore their reliance on Plaintiffs' services for the second concert was not reasonable. [65 at ¶¶ 9-10.] Defendants essentially argue that because they successfully defrauded Plaintiffs once, Plaintiffs should have known that Defendants would defraud them again, and should not have believed Defendants' promises regarding the second concert. The Court rejects this argument. See *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("Tolerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense."). Plaintiffs did not "ignore a manifest danger" (*Vigortone AG*

*Prod., Inc. v. PM AG Prod., Inc.*, 316 F.3d 641, 645 (7th Cir. 2002)), or close their eyes to "a known or obvious risk," *Mayer*, 51 F.3d at 676, and the Court will not dismiss a fraud claim because Plaintiffs continued to believe Defendants' misrepresentations after the first concert fell through.

Defendants next argue that because Plaintiff was previously defrauded by a music promoter, it was unreasonable for Plaintiffs to rely on Defendants for promoter services. [65 at ¶ 10.] However, a third party's failure, or even fraud, does not render Plaintiffs' reliance on Defendants unreasonable. *Cement-Lock v. Gas Tech. Inst.*, 2006 WL 3147700, at *2 (N.D. Ill. Nov. 1, 2006) (holding that "[p]laintiffs' awareness that [third parties] were suspected of fraud * * * does not preclude their demonstrating justifiable reliance on representations made by [the defendant]").

In sum, the SAC adequately alleges fraud, and Defendants' motion to dismiss with regard to Count I is denied.

### C. Conversion (Count II)

Defendants also move to dismiss Plaintiffs' conversion claim (Count II). "To state a claim for conversion under Illinois law, a plaintiff must allege: '(1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property.'" *Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 824 (7th Cir. 2018) (quoting *Gen. Motors Corp. v. Douglass*, 565 N.E.2d 93, 96-97 (Ill. App. Ct. 1990)). "Illinois law limits the situations where a plaintiff may maintain an action for the conversion of money." *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 967 (N.D. Ill. 2002). "Only if the money at issue can be described as specific

chattel—in other words, a specific fund or specific money in coin or bills—will conversion lie."
*Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002) (internal citations and quotations omitted). "Money is a specified and identifiable fund when it is not an estimate but rather a specific amount transferred to [the defendant] from an outside source." *LFG, LCC v. Navarre*, 2002 WL 1379112, *3 (N.D.Ill. June 26, 2002) (collecting cases).

In its prior order and opinion [57], the Court questioned whether the funds at issue were an appropriate subject for a conversion claim. [See 57 at 20.] Though Defendants do not address the issue, Plaintiffs argue that an action for conversion may lie "for money transferred from a plaintiff's bank account to a defendant's bank account where that money is for a specific, identifiable amount at issue," citing *Creative Trade Group, Inc. v. International Trade Alliance, Inc.,* 2009 WL 3713345, at *9 (N.D. Ill. Nov. 4, 2009) and *LFG, LLC. v. Navarre*, 2002 WL 1379112, at *3 (N.D. Ill. June 26, 2002). Applying Illinois law, *Navarre* notes that "[m]oney is a specified and identifiable fund when it is not an estimate but rather 'a specific amount transferred to [the defendant] from an outside source." *Id.* (collecting cases); see also *Chicago Dist. Council of Carpenters Welfare Fund v. Gleason & Fritzshall*, 295 Ill. App. 3d 719, 726 (1998) (holding that allegedly converted funds may be adequately identified by description and source). *Creative Trade Group, Inc.* assumed without deciding that a wire transfer, a specific and documented amount of money, was sufficiently identifiable to support a conversion claim. *Creative Trade Group, Inc.*, 2009 WL 3713345, at *9.

Here, the SAC alleges that Plaintiffs made five wire transfers to Defendants, in accordance with the allegedly fraudulent "Artist Agreements," as "deposits" for artists: $142,800 for Britney Spears on August 17, 2016; $150,000 for Snoop Dogg and $25,000 for Attika 7 on August 22, 2016; and $17,500 for Georgios Tsalikis and $32,500 for DJ Markus Schultz on September 7,

2016. These five specific amounts constitute transfers to Defendants from an outside source. *Desmond & Ahern, Ltd. v. Scheffki*, 2001 WL 1646562, at \*10 (N.D. Ill. Dec. 21, 2001) (citing *Roderick Dev. Inv. Co. v. Cmty. Bank of Edgewater*, 282 Ill. App. 3d 1052, 1059 (1996)). Therefore, the SAC adequately alleges a conversion claim.

The remaining question is whether the Plaintiffs have sufficiently alleged their rights to the funds. The SAC does not specifically break down Dachev's and Svilosa's right to the funds versus the Foundation's right to the funds. But it alleges that Dachev and Svilosa loaned the Foundation money for the purpose of securing artists to perform at the Charity Event [62 at ¶¶ 24-25], that Defendants agreed to act as Plaintiffs' agent in securing artists for the concert [62 at ¶ 16], that Plaintiffs wired a total of $367,800 to Defendants as "deposits" required by the allegedly fraudulent "Artist Agreements" [62 at ¶¶ 45-46], and that if an artist declined or could not be secured, the funds for that artist were to be returned to Plaintiffs [62 at ¶ 16]. It further alleges that after Plaintiffs transferred the funds to Defendants, Defendants were supposed to deliver those funds to certain musical artists, and that Defendants never held an ownership interest in those funds. [62 at ¶¶ 88-89]. Finally, it states that that after the Charity Event fell through, Plaintiffs—exercising, or at least attempting to exercise, control over the money—directed Defendants to use the funds to secure new artists for the 2017 Concert. [62 at ¶ 64].

Defendants argue that Plaintiffs cannot maintain a conversion action for two reasons. First, according to Defendants, when the Foundation transferred the money to them, it became Defendants' property and no longer belonged to the Foundation. Second, when Dachev and Svilosa loaned money to the Foundation, the money was no longer their property. This argument relies on the general rule that loan proceeds do not remain property of the lender, citing *Nat'l Life Real Estate Holdings, LLC v. Scarlato*, 83 N.E.3d 44, 56 (Ill. App. Ct. 1st Dist. 2017).

Taking the allegations in the SAC as true, it appears that the money did not become Defendants' property. Plaintiffs merely transferred the money to the Defendants so that Defendants could carry out the process of booking musical acts for the Charity Event, and later the 2017 Concert. The SAC alleges that the funds belonged to Plaintiffs (not just the Foundation), that Defendants were acting as Plaintiffs' agents, and that Defendants never had an ownership interest in the funds. [62 at ¶¶ 88-90.] Defendants point to no facts to the contrary, and *Karimi v. 401 N. Wabash Venture, LLC* does not require dismissal. 952 N.E.2d 1278 (Ill. App. Ct. 1st Dist. 2011). In *Karimi*¸ the court affirmed dismissal of a conversion claim because the subject of the claim—earnest money deposited for purchase of a condo—was "held for the mutual benefit of Seller and Purchaser" and therefore did not belong to plaintiff at all times. *Id.* at 1285. Here, there is no allegation that the "deposits" were held for the mutual benefit of Plaintiffs and Defendants, unlike in *Karimi*.

To be sure, the general rule is that a lender does not retain his property interest in a loan. See, *e.g.*, *United States v. Kristofic*, 847 F.2d 1295, 1296 (7th Cir. 1988) ("loan proceeds do not remain the property of the lender"). However, the exact terms of the loan agreement are not currently before of the Court, so the Court cannot determine the extent to which the normal rule applies.[3] Defendants have a point that Plaintiffs declined to attach the loan agreement to the SAC and may stand to benefit from that omission. Even if that is so, discovery should quickly reveal the relevant terms of the loan, and in the meantime, the Court is left with the allegations in the SAC, which do not warrant dismissal. The SAC adequately states a claim for conversion, and the motion to dismiss is denied with respect to Count II.

---

[3] It is conceivable that some portion of the funds was due to Defendants as a fee or commission, but there is no allegation to that effect, nor any document of record setting out the terms.

#### D.      Consumer Fraud (Counts III and IV)

Defendants move to dismiss Plaintiffs' claims under the Illinois Consumer Fraud Act ("ICFA"). To state a claim under the ICFA, a plaintiff must allege "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). The protections of the ICFA are ordinarily limited to "consumers." See *Roppo v. Travelers Cos.*, 100 F. Supp. 3d 636, 650 (N.D. Ill. 2015) (citing *Bank One Milwaukee v. Sanchez*, 783 N.E.2d 217, 220 (Ill. App. Ct. 2003)). A consumer is defined as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). The ICFA defines "merchandise" to include "services." 815 Ill. Comp. Stat. 505/1(b); see also *Skyline Int'l Dev. v. Citibank, F.S.B.*, 706 N.E.2d 942, 946 (Ill. App. Ct. 1998) (corporation purchasing services qualifies as a consumer under the ICFA). However, businesses may bring claims against other businesses under two circumstances: (1) when the business bringing suit is a consumer of the other business' merchandise; and (2) when a non-consumer business alleges that the challenged conduct "involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 192 F. Supp. 3d 943, 955 (N.D. Ill. 2016).

Defendants begin by arguing that Dachev's and Svilosa's individual claims must be dismissed because they never personally purchased or contracted to purchase Defendants' services. Instead, Defendants maintain, the Foundation made the purchase, and thus Dachev and Svilosa are not consumers under the ICFA. But the SAC alleges that Defendants agreed to act as

an agent of all the Plaintiffs, not just the Foundation, and those allegations control at this stage of the case. [62 at ¶ 16.]

Second, Defendants argue that Plaintiffs are not consumers because they purchased Defendants' services with the intention of reselling those services to the public. The service Plaintiffs purchased from Defendants was securing celebrity musicians to perform at concerts by negotiating contract terms and booking their performances. [65 at ¶ 13.] Defendants assert that Plaintiffs resold those services to concert-goers by selling tickets to the concerts. *Id*. Plaintiffs respond that they were selling the musician's performances, not reselling Defendants' promotional services. [62 at ¶¶ 111-113.]

The SAC alleges that Plaintiffs retained Defendants for their services in "promoting and securing artists to perform at the Charity Event" ([62 at ¶ 14]) and "to 'secure performance contracts' for the Charity Event" ([62 at ¶ 22]). The SAC describes the Charity Event as a "charity concert with the intent to help homeless and displaced children in world conflict zones" ([62 at ¶ 2]), for which Plaintiffs would sell tickets ([62 at ¶ 15]). Plaintiffs also allege that they did not intend to resell, and would not have resold, Defendants' services of securing musical acts for their concerts. ([62 at ¶¶ 97-100, 109-113]). These allegations suggest that Plaintiffs purchased Defendants' services for their own use and not for resale.

Defendants raise a further question, however, relating to services purchased by a business and incorporated into the business's final product. The Seventh Circuit has found that "a business purchaser is not a consumer" where "his only use of the purchased product is as an input into the making of a product that he sells[.]" *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 579 (7th Cir. 2004). The application of the rule is fairly clear when a business purchases a physical product. See, *e.g.*, *Prescott v. Argen Corp.*, 2014 WL 4638607, at *7 (N.D. Ill. Sept. 17, 2014)

(dentists who purchased dental crowns for use in dental practice were not "consumers" under the ICFA); *Pace Am., Inc. v. Elixir Indus.*, 2007 WL 495302, at \*4 (N.D. Ill. Feb. 13, 2007) (corporation that bought painted aluminum coil for use in its manufacturing of cargo and auto trailers was not a "consumer" under the ICFA). When a business purchases services, however, the rule may be more difficult to apply, as the parties' dueling citations show.

In *Ivanhoe Fin., Inc. v. Mortg. Essentials, Inc.*, a mortgage broker (defendant) submitted mortgage loan applications to a mortgage banker (plaintiff) for possible funding. 2004 WL 856591, at \*1 (N.D. Ill. Apr. 21, 2004). The banker brought an ICFA claim and alleged that the broker submitted applications containing false information. The defendant moved to dismiss, arguing that "plaintiff essentially resold the services" that defendant provided to its customers. *Id.* at 2. In denying the motion to dismiss, the court found that the plaintiff "used a mortgage broker to help find suitable potential borrowers," rather than incorporating defendant broker's services into a finished product.[4] *Id.*

By contrast, *Ivanhoe Fin., Inc. v. Highland Banc Corp.*, a mortgage case decided after *Garrity*, saw the services issue differently. 2004 WL 2091997, (N.D. Ill. Sept. 15, 2004). In *Highland Banc*, a mortgage broker (defendant) also submitted mortgage loan applications to a mortgage banker (plaintiff) for possible funding, and the banker brought an ICFA claim alleging that the broker submitted applications containing false information. *Id.*, at \*1. As an affirmative defense, the defendant alleged that the plaintiff lacked standing to pursue an ICFA claim because it was not a consumer. *Id.* at \*4. Noting that the plaintiff resold the mortgage to another bank, the court disagreed with the analysis in *Mortgage Essentials*, saying "the 'finished products' into

---

[4] The opinion states that "plaintiff did not incorporate Mortgage Essentials [i.e. the defendant mortgage broker] into any type of finished product." *Ivanhoe Fin., Inc. v. Mortg. Essentials, Inc.*, 2004 WL 856591, at \*2. But the context makes clear that the court is addressing the defendant's services, not the defendant corporation itself.

which defendants' services were incorporated were the home mortgage loans * * *. Those loans could not have been made without the raw materials, the applicants, provided by defendants." *Id.* at \*5. The court continued by describing the bank's relationship to the broker as "more akin to that of a manufacturer to a supplier than an individual consumer to a business" and found that the bank was not a "consumer" under the ICFA. *Id;* see also *First Magnus Fin. Corp. v. Dobrowski*, 387 F. Supp. 2d 786, 794 (N.D. Ill. 2005) (mortgage company that sued title company was not a "consumer" under the ICFA because it resold a mortgage and accompanying title insurance in the ordinary course of its business).

The differences between issuing mortgages and putting on a benefit concert limit the utility of both *Highland Banc* and *Mortgage Essentials* in the present context, and the cases present a close call. On balance, this Court concludes that securing musical artists is unlike "get[ting] grist for [a] mortgage banking mill," and finds the reasoning in *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark Rx, Inc.*, 2005 WL 991897 (N.D. Ill. Apr. 14, 2005), more persuasive in any event.[5] In that case, the plaintiff Fund provided health and retirement benefits to a carpenters' union. The Fund had a contract with Defendant Caremark, pursuant to which Caremark provided pharmacy benefits, including negotiating with retail pharmacies and drug manufacturers to obtain pharmaceuticals for the plaintiff Fund and its members. *Id.* at \*1. In assessing the motion to dismiss the plaintiff's ICFA claim, the court found that the Fund was a "consumer," because it "allege[d] that it purchased administrative services relating to pharmaceuticals from Defendants." *Id.* at \*6.

---

[5] That decision was later vacated for lack of subject matter jurisdiction. See 2005 WL 1950668 (N.D. Ill. Aug. 10, 2005, *aff'd sub nom. Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007).

As the Fund retained Caremark to negotiate for and obtain pharmaceuticals, Plaintiffs here retained Defendants to negotiate for and obtain musical acts. The Court is similarly persuaded that Plaintiffs have properly alleged that they are consumer under the ICFA. Therefore, the Court need not address the parties' arguments about whether Plaintiff alleged conduct addressed to the market generally or implicating consumer protection concerns. The SAC adequately states claims under the ICFA, and Defendants' motion to dismiss with regard to Counts III and IV is denied.

## IV.      Conclusion

For the reasons set forth above, Defendants' motion to dismiss [65] is denied. This case is set for further status hearing on January 16, 2020, at 9:00 a.m.

Date: December 30, 2019

                                                   
Robert M. Dow, Jr.
United States District Judge